UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEWARD CARNEY HOSPITAL, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. |
| | ) |
| MASSACHUSETTS NURSES ASSOCIATION, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **COMPLAINT**

1. This is an action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 et seq. ("LMRA") and the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), to set aside and vacate an arbitration award reinstating six nurses who were discharged by Plaintiff Steward Carney Hospital, Inc. ("Carney") after several instances of patient abuse and neglect occurred on the Adolescent Psychiatric Unit where they had been employed.

2. These instances of patient abuse and neglect and the general professional dysfunction on Carney's Adolescent Psychiatric Unit led to Department of Mental Health ("DMH") and Department of Children and Families ("DCF") investigations and a threat by the DMH to close the unit. The arbitrator's reinstatement award ordered the six nurses to be reinstated and reassigned to their same positions in the Adolescent Psychiatric Unit. This action seeks to vacate the reinstatement award on the grounds that enforcement of such an award would violate public policy and endanger the functioning of the newly-transformed Adolescent Psychiatric Unit.

3. This Court has jurisdiction over this action under 28 U.S.C. § 1331, as amended.

4. Carney is a corporation incorporated under the laws of the Commonwealth of Massachusetts with power to sue in its own name. Carney is duly authorized to transact business in the Commonwealth of Massachusetts and is doing business in the Commonwealth of Massachusetts, having an office and principal place of business in Dorchester, Massachusetts, and is an employer in an industry affecting commerce within the meaning of Section 301 of the LMRA.

5. Defendant Massachusetts Nurses Association ("MNA") is an unincorporated labor organization within the meaning of Section 301 of the LMRA and represents employees in an industry affecting commerce. MNA is the authorized bargaining representative for certain specified employees, including but not limited to Registered Nurses ("RNs") at Carney Hospital in Dorchester, Massachusetts.

6. The current collective bargaining agreement between Carney and MNA is effective from November 1, 2008 to September 30, 2014 and covers the terms and conditions of employment for RNs represented by MNA ("the Agreement"). This Agreement was in effect at all times material to this action and contains a just cause termination provision.

7. Carney's Adolescent Psychiatric Unit, known as "5 North," has, for more than a decade, served a population of seriously compromised adolescents who are typically referred to or placed in the unit by the courts or various state agencies charged with dealing with adolescents who have severe psychiatric difficulties. The population of the unit is at risk for self-injury and injury to others. Many have histories of childhood abuse and trauma.

8. The DMH has oversight responsibility for in-patient adolescent psychiatric units such as 5 North, and the unit cannot operate without a license from the DMH.

9. In 2011, the 5 North unit was staffed by approximately 12 RNs and 13 Mental Health Counselors ("MHCs").

10. Gail Douglas, RN, Cheryl Hendrick, RN, Linda Herr, RN, Kathleen Lang, RN, Scott McLellan, RN and Nydia Woods, RN (the "six grievants") were among the twelve nurses who worked various shifts on 5 North. The nurses on 5 North were long-serving employees on the unit.

11. The responsibilities and functions of a registered nurse are governed by state regulations, 244 Code of Massachusetts Regulations 3.00 ("RN Regulations"). The RN Regulations dictate, among other things, the limits on when and how an RN can delegate certain patient care duties and an RN's mandated reporter responsibilities in cases of suspected abuse or neglect.

12. Five significant traumatic incidents occurred on 5 North in April 2011: a sexual assault by an MHC on a patient; two injuries to patients caused by inappropriate roughness by MHCs; consensual sex between two patients; and the attempted suicide by one of those patients afterwards. These were extraordinarily serious events, all of which had to be investigated internally and reported to the DMH and other agencies for further investigation.

13. DMH and DCF conducted investigations into the five incidents and found "reasonable cause" to support allegations of excessive force by one MHC, sexual abuse by another MHC, physical abuse by a third MHC, and neglect by two additional MHCs.

14. DMH conducted an on-site review of Carney's 5 North unit. DMH stopped patient admissions on 5 North and threatened to close the unit and revoke Carney's DMH license. The DMH's investigation identified a serious problem with the culture on 5 North, including RNs abdicating their nursing roles to MHCs.

15. Carney conducted an internal investigation and also hired an outside investigator – a former Attorney General of Massachusetts – to conduct an independent review of the facts and circumstances surrounding the April 2011 incidents on 5 North. The investigations revealed, among other things, a "culture of mediocrity" and lack of transparency on 5 North, a "code of silence" and lack of reporting amongst the RNs, and improper delegation of patient duties by the RNs, all that had lasted for years.

16. Based on the results of the internal investigation and independent review, Carney decided to discharge the entire staff on 5 North in order to ensure a safe environment for the adolescent mental health patients who sought out or were placed at Carney for treatment. The terminations included all nurses and MHCs, as well as the hospital managers responsible for nursing care on the unit.

17. Carney also hired an external consultant to help rebuild 5 North and develop a strategic improvement plan for review and approval by DMH. Carney hired and trained new RNs and MHCs and instituted new treatment modalities, based on the concept of "trauma-centered care," to make the unit more effective.

18. DMH ultimately decided to relicense Carney's psychiatric units in August 2011, with greater monitoring and a corrective action plan to improve the culture on the adolescent unit. Compliance with the corrective action plan is essential to Carney maintaining its license. Carney has remained in compliance with the corrective action plan since August 2011 and the strategic improvement plan and corrective action plan have brought a positive culture change to the unit.

19.     MNA filed a grievance on behalf of the six grievants (among others) and subsequently commenced an arbitration with regard to the discharge of the six grievants. Arbitration involving the other grievants is pending.

20.     Hearings were held before Arbitrator Philip Dunn on January 31, 2012, February 2, 2012, February 3, 2012, February 13, 2012, March 9, 2012, April 18, 2012, May 1, 2012 and May 24, 2012.  A transcript was made of the testimony.

21.     At the hearing, Carney presented testimonial and documentary evidence demonstrating that the six grievants – along with all nurses employed on 5 North – had collective responsibility for the dysfunction of the unit, leading to serious patient care violations and substandard care.

22.     Testimony at the arbitration established that the culture of mediocrity and substandard care had persisted for years on 5 North; that all of the nurses working on the unit were well aware of its massive deficiencies, which were obvious and persistent and included improper delegation of duties by nurses to MHCs; and that none of the grievants ever filed a complaint with either senior hospital administrators or the DMH or DCF concerning the substandard care on the unit.  Nor had any nurse filed a complaint under M.G.L. Ch. 119, Sect. 51A as a mandated reporter.

23.     The 5 North manager in charge of oversight of the unit at the time of the terminations testified that the nurses on the unit had resisted the trauma-centered care model. Carney also presented evidence at the hearing, including testimony by the Director of Licensing for DMH, that reinstatement of the grievants to 5 North could jeopardize the improved culture on 5 North and risk Carney's DMH license.  Carney's expert offered uncontradicted testimony that

reinstatement of the nurses to the adolescent unit would likely lead to a repetition of the same behaviors that created the dysfunction on 5 North initially.

24. The MNA moved for a "directed verdict" after presentation of Carney's case, without presenting a single witness. Carney's evidence was uncontradicted.

25. The parties submitted post-arbitration briefs to the arbitrator on or about March 12, 2013. Prior to submitting its brief to the arbitrator, Carney offered the six grievants unconditional reinstatement with back pay to the adult psychiatric unit at Carney Hospital, without any admission of liability and in an attempt to avoid prolonged litigation. If any RN accepted the offer, s/he would receive the same rate of pay and benefits s/he received when s/he worked on 5 North and would be assigned to equivalent shifts. Reinstatement of the grievants to the adult psychiatric unit would not, in Carney's judgment, jeopardize the critically important changes that had occurred in 5 North due to its new leadership, new treatment approach, and new RNs and MHCs.

26. MNA rejected Carney's offer of unconditional reinstatement.

27. Carney notified Arbitrator Dunn of its offer of unconditional reinstatement in Carney's post-arbitration brief.

28. Arbitrator Dunn sent the parties his Opinion and Award on April 22, 2013, granting MNA's motion. A true and accurate copy of this Opinion and Award is attached as Exhibit A.

29. In his Opinion and Award, Arbitrator Dunn summarized the uncontradicted evidence offered by Carney and, despite acknowledging that "some awful things happened on 5 North in April 2011," that there were "five deeply distressing incidents [that] occurred in April 2011" on 5 North, and that there was "broadly reported dysfunction within 5 North," Arbitrator

Dunn found that none of the six grievants were "the perpetrators in those very serious incidents" nor "personally contributed to a 'culture of mediocrity and/or a deviant culture.'" (Ex. A at 29, 37).

30.     Arbitrator Dunn ordered Carney to reinstate the six grievants to the positions and schedules they previously held on 5 North, expunge their personnel files, and make the grievants whole for all wages and benefits lost.  Arbitrator Dunn permitted Carney to initially reinstate the six grievants to positions other than on 5 North while being provided training as Carney deems appropriate, consistent with the training that has been provided to other nurses employed to work on 5 North.  Arbitrator Dunn also permitted Carney to stagger the return of the six grievants to 5 North over the span of up to a month.  (Ex. A at 37-38).

31.     Arbitrator Dunn refused to find that the matter was moot due to Carney's offer of reinstatement with full back pay and benefits to a psychiatric unit at Carney Hospital other than 5 North because he claimed the offer of reinstatement was "not part of the record before this arbitrator."  (Ex. A at 24).

32.     Arbitrator Dunn also refused to limit his reinstatement order to returning the grievants to the adult psychiatric unit, and instead reinstated them to the reconstituted adolescent psychiatric unit that had been the site of the substandard care that led to the nurses' termination in the first instance.  (Ex. A at 36-37).

33.     Reinstatement of the grievants to 5 North – which now, due to its lower patient census, is only staffed with approximately seven nurses – will result in the displacement and removal of virtually all of the RNs who have been serving in the reconstituted unit that had been licensed by DMH in August, 2011.  All of the gains achieved in 5 North since its overhaul will be in jeopardy.

## COUNT I – VACATION OF AWARD

34. The allegations of paragraphs 1 through 33 are incorporated by reference herein.

35. Enforcing the award of reinstatement to the 5 North unit, in light of Carney's substantial uncontradicted evidence of the risks to patient safety of such reinstatement, would place the patients at risk and violate established Massachusetts public policy in favor of ensuring safe and standard care for all patients, and full compliance by nurses with the RN Regulations, mandatory reporting requirements regarding suspected abuse of minors, and all other health care requirements and regulations.

WHEREFORE, the Plaintiff prays the Court:

1. To vacate the said award issued by the Arbitrator on the grounds that enforcement of the award would be in violation of public policy.

2. For such other further and equitable relief as the Court deems just and necessary.

Respectfully submitted,

Dated: May 22, 2013

/s/ Joseph W. Ambash_____
Joseph W. Ambash, Esq., BBO #017060
jambash@laborlawyers.com
Katharine A. Crawford, Esq., BBO #624192
kcrawford@laborlawyers.com
FISHER & PHILLIPS LLP
200 State Street, 13th Floor
Boston, Massachusetts 02109
(617) 722-0044

Attorneys for Plaintiff Steward Carney Hospital, Inc.