# Exhibit A

# Labor Relations Connection

## VOLUNTARY LABOR ARBITRATION TRIBUNAL

In the Matter of Arbitration Between

**MASSACHUSETTS NURSES ASSOCIATION**

**-and-**

**STEWARD HEALTH CARE SYSTEM, LLC,**
**CARNEY HOSPITAL**

## AWARD OF THE ARBITRATOR

The UNDERSIGNED ARBITRATOR(S), having been designated in accordance with the arbitration agreement entered into by the above-named Parties, and dated         and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARDS as follows:

The Employer violated the collective bargaining agreement at Article 14.8, discipline and discharge, by discharging Gail Douglas, RN, Cheryl Hendrick, RN, Linda Herr, RN, Kathleen Lang, RN, Scott McLellan, RN and Nydia Woods, RN.

The Hospital shall reinstate these six nurses to the positions and schedules they previously held on the adolescent psychiatric unit.  The Employer shall expunge from their personnel files any allegations or findings of wrongdoing by any of the grievants regarding the April 2011 incidents and the ongoing problems on 5 North prior to their terminations. The Hospital shall make the grievants whole for all wages and benefits they lost by virtue of their unjust terminations.  Any back payments due to the grievants pursuant to this award shall be made with interest at the rate of six percent per annum, compounded annually.

The Employer may initially reinstate any or all of the six grievants to positions other than on 5 North, while each is given further training as the Employer deems appropriate, consistent with the training provided to other nurses employed to work on 5 North.  The grievants shall receive full wages and benefits while they are undergoing any such training.

The Employer may stagger the return of the six grievants from other assignments to 5N over the span of up to a month, so that the returnees will be blended with staff that have been on the reconstituted unit during the absence of the six grievants.

The arbitrator retains jurisdiction solely to address any disputes that may arise regarding the application of this remedial order.

Date:          April 20, 2013

_____

Philip Dunn, Arbitrator

Appearances:            FISHER & PHILLIPS LLP, by Joseph W. Ambash, Esq. and Katherine A. Crawford, Esq., counsel for the Hospital

                            McDONALD, LAMOND, CANZONERI & HICKERNELL, by Alan J. McDonald, Esq., counsel for the MNA

## STIPULATED ISSUE

Did the Employer violate the collective bargaining agreement at Article 14.8, discipline and discharge, by discharging Gail Douglas, RN, Cheryl Hendrick, RN, Linda Herr, RN, Kathleen Lang, RN, Scott McLellan, RN and/or Nydia Woods, RN?  If so, what shall be the remedy?

## RELEVANT CONTRACT LANGUAGE

Article 14, Section 8.  A nurse who has completed her probationary period ... shall not be suspended, discharged, demoted or otherwise disciplined except for just cause.

## PROCEDURAL STATEMENT

This case involves a challenge by the Massachusetts Nurses Association ("MNA" or "Union") of the termination of six registered nurses ("RNS")  who had worked in the in-patient, adolescent psychiatric unit of Carney Hospital ("Carney," "Hospital," or "Employer").  The Hospital over the course of eight hearing days presented its case in chief, in support of its position that it had just cause to terminate these six nurses.

At the close of the Hospital's presentation, the MNA moved for a directed verdict, asserting that the Hospital had not presented sufficient evidence to establish that it had just cause to take these termination actions.  The arbitrator agreed to accept briefs from the parties, through which they could fully articulate their respective positions on the MNA's motion.    Those briefs have now been received.

## EVIDENCE PRESENTED

Carney Hospital ("Carney") is a community hospital located in Dorchester, Massachusetts.  In addition to medical/surgical, surgery, and emergency units, Carney treats a significant psychiatric population on an inpatient and outpatient basis.  There are three inpatient psychiatric units: 4 Southeast, an adult behavioral-health unit; 4 Southwest, a geriatric unit; and 5 North ("5N"), an adolescent unit.  5N serves an adolescent population ages 12 to 18 with various mental illnesses.  Patients are referred to 5N in a variety of ways, including through residential treatment programs, the emergency department, and physicians' offices.  Many of the patients receiving care on 5N are in the custody of a state agency, most typically the Department of Children and Families ("DCF").  These adolescent patients are some of the neediest and most vulnerable in the state, often with severe trauma and/or histories of abuse or neglect.

At the time of the events that led to the discharge of these six nurses, 5N was a 14 bed, locked nursing unit with a double-door entrance leading into a long hallway.  Off the hallway was a kitchen, patient rooms, a nurses' station, and a school room, and at the end of the hallway there was an activity room.  The nurses' station contained paperwork, medication and computers; it was kept locked and patients were not allowed into that room.

As an inpatient psychiatric unit, 5N was staffed 24/7, typically with two registered nurses (RNS) and a number of mental health counselors (MHCs or counselors) on duty on any given shift.  One of the RNS was designated as the charge nurse for any given shift, and she/he was responsible for the overall functioning of the unit on that shift, including any duties delegated by the RNS to the MHCs.  The RNS assigned to the shift, and in particular the charge nurse, were responsible for assessing and monitoring the health of the patients, providing treatments and

administering medications, and generally assuring that all patient care as prescribed through physicians' orders was carried out in a safe and efficient manner.

One very important task, given the very vulnerable population on 5N, was the visual check of the patients.  Such visual checks were ordered by physicians and ranged from every five minutes to every fifteen minutes, the latter being the longest period of time any patient was to go unchecked.  It was the responsibility of the nurses to assure that these checks were being carried out, as per the physicians' orders.  Carney's Department of Psychiatry had a patient checks policy.  Under that policy, RNS on 5N were permitted to delegate to MHCs the prescribed, visual checks of patients, and MHCs were trained in how to perform this task.  However, it remained the responsibility of the RNS to assure that the checks were properly performed, in accordance with the physicians' orders.

During the day shift, 5N was also staffed by social workers, group leaders, and physicians; and also by teachers working in the school portion of the unit.  Carney had recently created a clinical coordinator position, which was filled by Social Worker David Pennacchia.  The night shift, unsurprisingly, had the least number of staff assigned.  The evening shift was the most challenging for the RNS and MHCs assigned, since activities had stopped for the day, medications needed to be distributed, and the adolescent patients were still up and about but without scheduled activities to engage them.

In April 2011, 5N and the two adult psychiatric units were collectively managed by a patient-care director of psychiatry, Carmel Hanrahan, RN.  She in turn reported to Chief Nursing Officer Carol Krzywda.  There had previously been a full-time nurse manager (or nurse leader) who was responsible for managing 5N exclusively, who reported to Hanrahan.  However, the last

incumbent in that nurse leader position, Peggy Queeney, had retired prior to April 2011, and that

position had not been refilled.[1]

The three psychiatric units at Carney are together licensed by the Massachusetts

Departments of Mental Health ("DMH") and Public Health ("DPH").  The license is issued every

two years, and DMH undertakes a detailed review of the units what the biannual application for

re-licensing is made.  None of the three psychiatric units, including 5N, is permitted to serve

patients without this license from the state regulators.

In addition to the psychiatric units being licensed, of course, the RNS working on those

units are themselves professionally licensed by the Massachusetts Board of Registration in

Nursing.  The responsibilities and functions of an RN are governed by state regulations which are

set forth at 244 Code of Massachusetts Regulations 3.00 ("RN Regulations").

Pursuant to their licenses, the RNS working on 5N on any given shift retained "full and

ultimate responsibility for the quality of nursing care" which was being provided on the

---

[1]Nan Stomberg, an advanced practice psychiatric nurse, served from 1999 to early 2009 as the director of nursing for the Licensing Division of DMH.  After the events of April 2011 on 5N, she was retained by Carney as a consultant to assist in the rebuilding of the adolescent psychiatric unit.  It was toward the end of Stomberg's tenure as director at DMH that Ms. Queeney retired from the position of manager of 5N, and was not replaced.  Prior to Queeney's departure, Stomberg testified, she was not aware of any significant problems in the functioning of 5N.  However, she testified, after Queeney retired and her position was not refilled, that left Stomberg with a concern about the lack of appropriate managers or management on the 5N unit.

Lizbeth Kinkead, the director of licensing for DMH since June 2009, gave consistent testimony.  She has served in the licensing division of DMH since 2001, and since 2001 has been involved in the biannual surveying and licensing of Carney's adolescent psychiatric unit.  Kinkead noted that the former commissioner of DMH, Elizabeth Childs, had served as Carney's medical director for all three psychiatric units.  Under Childs' tenure at Carney, Kinkead testified, the services provided to the psychiatric patients at Carney were top notch, "some of our best services that we licensed."  However, after Childs left Carney (apparently several years before 2010, the year in which Steward took over Carney from Caritas), things started to slide.  "People would leave and vacate their positions, and ... they never quite filled them with some of the quality staff, the senior clinical leadership that they had had....  Training issues were – we were concerned about that.  We were always monitoring restraint and seclusion, and that seemed to be creeping up again....  So over time I have to say we were concerned."  However, the concerns of the DMH licensing division never prior to 2011 rose to the level of considering suspending or withdrawing Carney's license to operate the in-patient psychiatric units, Kinkead testified.

adolescent psychiatry unit on their shift.  Certain nursing activities could be delegated to unlicensed personnel such as the MHCs; for example, periodic patient checks on prescribed schedules could be assigned to the MHCs, but the RN making that delegation remained responsible for the proper accomplishment of that delegated task.  Other nursing tasks, such as the administration of medications, could not be delegated to unlicensed staff, but had to be performed by the licensed RNS themselves.

Several Hospital witnesses testified regarding the reporting obligations which applied to the RNS regarding incidents that might occur on their shifts on 5N.  Their testimony in that regard can be summarized as follows.  Under a nurse's license, as well as through her employment with Carney, the RNS on 5N had myriad incident-reporting obligations in cases of serious incidents or accidents.  Any incident involving serious injury to a patient (regardless of causation), an allegation of abuse, or an unanticipated death had to be reported.  In addition, any known or suspected abuse or neglect of a child under 18 had to have been reported to DCF.

As RNS working on a psychiatric unit, they were obligated to contact DMH if they believed that staffing was inadequate or other staff members' poor work was having a detrimental impact on the patients.  Required reporting would initially go to the RNS' nursing managers, they being Nurse Supervisor Queeney, and after her retirement, directly to Patient-Care Director of Psychiatry Carmel Hanrahan.  However, the Hospitals' witnesses testified, if the manager receiving the report failed to attend to the matter and the deficiency remained uncorrected, the RN was obligated to report higher up the chain of command, all the way to the president of the hospital; and if the improper or deficient patient care still continued uncorrected, the RN had to report the matter to the outside regulatory bodies, DMH, DCF, and/or DPH.

Keeping this background information in mind, we can turn to five events on 5N in April 2011 which triggered numerous investigations, and ultimately led the Hospital to a mass termination of all the management and staff connected with the adolescent psychiatric unit, including 13 bargaining unit RNS and all the MHCs assigned to 5N.  The MNA filed grievances on behalf of the 13 terminated RNS.  This arbitration proceeding involves six of those 13 nurses; the record does not disclose how these six terminations were selected for consolidation into this unified arbitration proceeding.

### April 2, 2011 Incident

On Monday, April 4, Carney's risk manager, Ms. Lydik-Kaslow, received and read through an incident report which RN Lang had filed regarding an event which had transpired at about noon on Saturday, April 2.  The incident involved a complaint that after a female patient had thrown a cup of water onto an MHC, Mr. Kano, he allegedly had grabbed the patient's ponytail from behind and had pushed the patient into the wall, with both the patient and the MHC then falling to the floor.

Ms. Lydik-Kaslow investigated that incident by reviewing the patient's medical record and speaking to staff who had witnessed the April 2 incident.  The charge nurse for that day shift was RN Kathleen Lang (one of the grievants herein).   Also working on 5N on that Saturday day was RN Shawna Kennedy, who had floated over from the adult psychiatric unit for that shift.  Three MHCs were assigned to 5N on that Saturday day shift.

According to Ms. Lydik-Kaslow's testimony, RN Kennedy reported the following to Lydik-Kaslow.  Kennedy had observed the entire interaction between the female patient and MHC Kano.  The counselor was sitting in a chair.  The patient threw water in his face, then he

got up and grabbed her ponytail from behind, and the patient went into the wall.  After seeing

this, Kennedy attended to other patients who had been present when this incident happened.

Kennedy indicated to Lydik-Kaslow that "the other staff members didn't observe the event in the

manner that she observed it, ... that other staff members didn't view it as inappropriate contact."

Lydik-Kaslow testified on direct as follows, regarding what RN Lang told her on April 4,

when she was asked about the April 2 incident.  Lang reported that after having had water thrown

in his face, MHC Kano "got up and slid in water that had dropped in the course of the water

projecting to him from the female patient, and stated that he got up to hold the patient in a

physical hold because of concerns that she may continue to threaten or attack other people...."

On cross examination, Ms. Lydik-Kaslow testified that as she came to understand it, "Ms.

Lang was leading the patient to her patient room.... She was, I believe, a little bit in front of the

patient....  She (Lang) didn't witness the entire event.  She said she witnessed water on the floor

and then the counselor and the patient slipping into the water and going against the wall ... which

is not verbatim but what she basically reported in the incident report."  Lydik-Kaslow conceded

that if the MHC in fact grabbed the patient's hair, RN Lang may not have seen that; Lang "did

report him contacting the patient physically."

As Ms. Lydik-Kaslow viewed it during her investigation, RN Lang herself had

categorized  the MHC's contact with the patient "as a physical hold."  Given that categorization

by RN Lang, and since a "physical hold" is a type of restraint, Ms. Lydik-Kaslow had two

concerns.  First of all, restraints are only to be utilized on patients when the patient is

behaviorally out of control, and all other means of de-escalation have been exhausted; restraints

should only be used when there is a substantial, imminent threat of serious harm to the patient or

others.  Restraints can only be applied if authorized by an RN, since the MHCs are not authorized to themselves initiate restraints.  Ms. Lydik-Kaslow was of the view that there was no evidence that a physical hold was necessary during this April 2 incident.

Second, if a restraint had been necessary, then it was RN Lang's responsibility to document at the time that the hold/restraint was initiated, and the reason for it.  Such documentation is required by DMH.  Yet, RN Lang did not document the application of restraint in the patient's medical record, nor with DMH, as required of her by 104 CMR 27.12, Ms. Lydik-Kaslow testified.

Ms. Lydik-Kaslow as part of her investigation also reviewed whether RN Lang had properly notified the patient's physician of record, Dr. Pravdova, who was the physician responsible for the total care of this patient who was residing in 5N.  Ms. Lydik-Kaslow noted that RN Lang did make the nursing supervisor aware of the situation.[2]  However, Ms. Lydik-Kaslow discovered, the patient's physician of record had not been notified until the following Monday, April 4, when that physician was next on duty following the event of April 2.  Carney's policy was that the physical restraint of a patient had to be reported by the RN  to the physician of record "as soon as possible," which Lydik-Kaslow interpreted to mean as soon as the patient no longer required care by the nurse.

RN Kennedy was called as a witness by the Hospital, and testified at day eight of the arbitration hearings.  She testified that Charge Nurse Lang attended to the patient immediately after the incident.  Kennedy did not see exactly where Lang was during the confrontation

---

[2]the "nurse supervisor" who RN Lang had informed was the nursing supervisor for the off shifts, Marie Hudson, who had supervisory responsibility over all the nurses working throughout Carney on that day shift.

between the patient and Kano, and thus Kennedy was not able to say how much of the incident

RN Lang had personally observed.  Kennedy after the incident was over spoke to Lang, and

reported to her what Kennedy had seen as the incident unfolded.  Kennedy testified that Lang

ultimately directed MHC Kano to leave 5N, when it became clear that his continued presence on

the unit would hinder the de-escalation of the patient.

Ms. Lang did write an incident report, and later an addendum to that initial note, which

went to Lydik-Kaslow.  RN Lang's note indicated that she did immediately inform the on-duty

physician at the Hospital, that being surgical moonlighter Dr. Bolgar; that physician responded to

5N, checked out the patient, and determined that there was nothing more than a abrasion on the

patient's cheek and that no significant medical care was warranted.  RN Lang also informed the

nurse supervisor what had transpired, apparently soon after the incident was over.  RN Lang also,

that weekend, gave the requisite notice to DCF guardian.

Lydik-Kaslow testified that RN Lang also may have informed Dr. Korndorfer, who is the

other attending physician who shares with Dr. Pravdova the attending duties on 5N.  Dr.

Korndorfer was providing the on-call, weekend coverage on the weekend of April 2; it was Dr.

Pravdova's weekend off from that on-call coverage.  Lydik-Kaslow indicated that she was unsure

whether notifying Dr. Korndorfer, if RN Lang gave such notification on April 2, would have

fulfilled the obligation to give the physician of record notice of the incident "as soon as

possible."

When DMH received notification of April 2 incident, Investigator Scott Sardo came to

Carney and carried out an on-site investigation.  His report concluded that MHC Kano had

inappropriately grabbed the female patient from behind in an improper effort to restrain her, and

that he used excessive force.[3]   Neither Sardo nor his superior at DMH, Ms. Kinkead, made any

finding that Ms. Lang did anything wrong with respect to the incident on April 2.

Neither Lydik-Kaslow, nor any other Hospital administrator, reported after their

investigation of the April 2 incident that RN Lang's involvement was in any way improper.  Prior

to her termination, RN Lang was not given any notice that her performance regarding the April 2

incident had been inadequate, and she was given no opportunity to defend herself against any of

the concerns ultimately identified by Lydik-Kaslow in her testimony at the arbitration hearings.

### April 15, 2011 Incident

On the evening of April 22, a female adolescent patient on 5N was speaking with two

MHCs, and she stated that a male MHC had sexually assaulted her on the evening shift of April

15.  The MHCs immediately reported this incredibly serious allegation which they had heard

from the patient, and Ms. Lydik-Kaslow in turn immediately notified DMH and DCF.  Lydik-

Kaslow then commenced an investigation.

Two RNS were on duty on the evening shift on April 15.  Neither of them are among the

six grievants in this arbitration proceeding, so the propriety of the actions of those two RNS is

not a matter for determination by this arbitrator.

One of those nurses did not make herself available for interview by Ms. Lydik-Kaslow.

The other RN told Lydik-Kaslow that she had not assigned specific patient checks to he MHCs

that night, leaving the MHCs to figure out for themselves who would do which checks.  When

Lydik-Kaslow interviewed the MHCs who working on that evening shift, none of them could

identify who was on checks during the time frame identified by the patient as when the assault

---

[3]After investigation, Carney terminated the employment of MHC Kano.

occurred.   Ms. Lydik-Kaslow felt that it was problematic to have the MHCs decide amongst

themselves who would do the patient checks on the shift, since that approach indicated a lack of

leadership on the unit and could result in checks being missed.

### April 18, 2011 Incident

On April 25, 2011, still another incident from 5N came to the attention of Ms. Lydik-

Kaslow, this one having occurred on the evening shift of April 18.   The nurses on duty on the

evening of April 18 were Linda Herr, RN, and Claire Langdon, RN, and Lynne Blanchard, RN.

Of those three RNS, only Ms. Herr is a grievant in this arbitration proceeding.   Ms. Herr was the

charge nurse for the shift. There were three MHCs on duty on that shift, as well.   When the

incident occurred, RN Herr was off the unit taking her authorized dinner break, which left RNS

Langdon and Blanchard on 5N at the time in question.

Investigations by DMH and Lydik-Kaslow suggest that the following transpired while

Herr was away for her dinner break.  A male patient was escorted to his room by an MHC after

an incident between that patient and another patient.   RN Langdon went into the patient's room

with the intention to administer Benedryl to the patient.   However, she gave the Benedryl to the

MHC, for him to administer to the patient.[4]   In the patient's room, the MHC asked RN Langdon

to step out of the room, which she did.   Moments later, the patient had a swollen and bleeding

lower lip and a loose tooth.   The patient thereafter reported to Langdon that he had hit his face on

the sink in his room as the MHC attempted to de-escalate him.

---

[4]The administration of medication is a non-delegable duty of an RN, so it apparantly was improper for her to give the Benedryl to the MHC to administer to the patient.

Ms. Langdon did not filed an incident report, and that failure presumably was a violation of both Carney policy and her obligation as a mandated reporter of suspected cases of patient and/or child abuse.  When Ms. Lydik-Kaslow asked Langdon why she did not report the incident, Ms. Langdon indicated that there was a general fear on 5N of reporting misconduct by the MHCs because the MHCs would threaten not to come to the assistance of the nurses if and when the patients became aggressive.

### April 24, 2011 Incident

On the evening of April 24, a group leader reported to Ms. Lydik-Kaslow that a female patient had just reported a sexual encounter between another female patient and male patient. Kathleen Dwyer, RN, was designated as the charge nurse for the shift; she is not a grievant in this proceeding.  Nydia Woods, RN, who is a grievant in this proceeding, was the other nurse on duty along with Dwyer.

Through her investigation, Lydik-Kaslow heard from the MHCs that they had not been assigned by an RN to do the patient checks on the evening shifts, but rather, they were responsible for themselves working out which MHCs would carry out patient checks at what times.  Ms. Lydik-Kaslow through her investigation concluded that no MHC was assigned to do patient checks during the time frame in question.  She further concluded that none of the MHCs were even doing checks at the time in question, since they were all tied up with other activities and responsibilities.  In that same time frame, RN Woods was doing a patient one-on-one intervention, and Charge Nurse Dwyer was in the nurses' station.  Lydik-Kaslow concluded that as the charge nurse, it had been Ms. Dwyer's responsibility to assure that patient checks were assigned and were being properly performed as scheduled.

### April 26, 2011 Incident

The April 24 incident in turn triggered a very serious incident on April 26, when a male patient attempted suicide.  This was the same male patient who on April 24 had engaged in the sexual encounter with a female patient.

Lydik-Kaslow learned of the suicide attempt immediately.  Through her investigation, she did not find any staff wrongdoing on April 26.  She learned from the male patient that his suicidal gesture was motivated by the sexual encounter of April 24.  Thus, Lydik-Kaslow was of the view that the April 26 suicide attempt was a direct result of the lack of supervision and patient visual checks on the evening of April 24.  Though there was no staff wrongdoing on April 26, Lydik-Kaslow nonetheless reported to DPH, in order to be as transparent as possible with the state regulatory agencies.

### The Ensuing Investigations and Mass Terminations of Employment

DMH investigated the April 2 incident, which involved the allegations of a MHC grabbing a patient from behind by her hair and pushing her into a wall.  DCF investigated the other three incidents.   These two investigating agencies found "reasonable cause" to support the allegations of excessive force by one MHC; sexual abuse by another MHC; physical abuse by a third MHC; and neglect by two additional MHCs.  They made no reasonable cause findings regarding any RN.

The reports generated by these investigations were reviewed by Lizbeth Kinkead, the director of licensing for DMH.  The number of incidents reported out of 5N in such a short time left Kinkead greatly concerned about the safety and care being provided to the youth on that unit.  Thereafter, Kinkead personally came on site for several unannounced visits, to assess the

situation on the adolescent psychiatric unit.  She stopped all patient admissions to 5N, because

DMH had serious concerns about the safety and care that was being provided.  Kinkead was

made aware that not long after the multiple April 2011 incidents, Carney placed on leave all the

MHCs and RNs who were regularly assigned to work on 5N, as well as Chief Nursing Officer

Carol Krzywda and Patient Care Director Carmel Hanrahan (who had served as the manager

collectively over all three psychiatric units, including 5N).   Kinkead met almost daily with senior

Carney leadership, including the new Chief Nursing Officer Michelle Fey and Hospital President

Bill Walczak.  Ms. Kinkead demanded assurances that Carney would make the needed changes

to 5N so as to improve the level of care, with much more intensive regulatory oversight.

Kinkead made it clear to senior leadership that unless marked improvement were made to the

operation of 5N, there was a very real possibility that DMH might order the closing of 5N, and

strip Carney of its license to operate a adolescent psychiatric unit.

As discussed earlier, even before Kinkead and other DMH and DCF staff carried out their

investigations, Lydik-Kaslow had separately investigated the four April incidents.  In late April,

she met briefly with Hospital President Walczak and shared with him a broad overview of her

findings and concerns about the goings-on within 5N.  That meeting lasted about 10 minutes, and

Lydik-Kaslow presented her findings in general terms.  She did not provide Walczak with any

documentation in that brief meeting.  "I didn't get into particularities, but I discussed some of the

broad takeaways from the week or so that I spent investigating, which were a consistent lack of

communication between the teams on the unit, consistent teamwork dynamic failing between the

nurses and counselors, lack of leadership from shift to shift, checks not being performed, no

oversight of checks being performed.  Basically the broad takeaways that I learned when I

finished the investigations." Lydik-Kaslow did not mention any names or particular nurses to President Walczak.[5]

Shortly after DMH came on-site to evaluate the adolescent psychiatric unit at Carney, Steward engaged Attorney Scott Harshbarger, formerly the Attorney General of Massachusetts, to conduct an independent review of the facts and circumstances surrounding the April 2011 incidents on 5N. Over a two week period, Mr. Harshbarger and his team conducted almost fifty interviews of Carney staff, including managers and MHCs and RNS who had been put on administrative leave.

After all the interviews had been conducted by his team, Mr. Harshbarger prepared two written reports for the Hospital. The first, a preliminary report, was dated May 26, 2011. He presented that written report to President Walczak on that date. Earlier, on May 13, Harshbarger in a face to face meeting had verbally presented his preliminary findings to the president.

The May 26 report read in part as follows:

> Re:    Carney Hospital Adolescent Psych Unit –
>        Preliminary Findings....
>
> We were retained to interview the staff and share conclusions  –
> supported by the facts  – with the leadership of Carney for such
> action as the President ... deems appropriate. For many reasons,
> including a number of candid interviews with forthcoming
> management and staff (including RNS and MHCs, and a number of

---

[5]Lydik-Kaslow during her investigations did not speak with Gail Douglas, Cheryl Hendrick, Linda Herr, or Scott McLellan, and had no information about how they oversaw patient checks on shifts when they served as charge nurse. Lydik-Kaslow did speak to Kathleen Lang, but did not ask her or otherwise gain any information about how she oversaw patient checks when she served as charge nurse. Lydik-Kaslow spoke to Nydia Woods, but did not ask whether she ever served as charge nurse, or if she did, how she oversaw patient checks when she so served. Similarly, with regard to leadership and communication skills, Lydik-Kaslow did not learn from her investigation specifically how any of these six individual nurses performed in those regards, except in the context of their involvement (if any) in the four specific incidents from April 2011 which she investigated.

clear themes that were repeated by staff and managers, we are
confident that our preliminary findings are supported by the facts.

In short, we agree with several of those we interviewed who
believed that the only way to reform the Unit was to "blow it up
and start anew...."  We have concluded that the Unit cannot
continue to function as it is currently composed.  In our opinion, it
would be prudent to replace the current personnel in order to
ensure quality care for these vulnerable patients.

<u>Summary of Preliminary Findings</u>

1.     As an initial matter, we are encouraged by the new and different
       approach to patient care and Unit management initiated by Bill
       Walczak since his hiring as Carney's new President in January.  In
       addition, we agree with his decision, following an oral report of
       our preliminary findings on May 13th, to terminate Carol Krzywda,
       the Chief Nursing Officer, and Carmel Hanrahan, the Patient Care
       Director responsible for the Unit.  These changes will begin to
       address the serious weaknesses we found in the supervisory and
       managerial structure of the Unit, including but not limited to lack
       of a clear reporting structure, lack of accountability, oversight of
       patient care and quality, patient and staff safety concerns, and a
       flawed and rarely invoked disciplinary process.

2.     These staff and professional performance, supervisory and
       managerial weaknesses at the Unit and departmental level have
       been enhanced dramatically by the ... obvious fact that the
       adolescent Unit is "very tough"  – with mentally and physically
       challenged teenagers, often in aggressive and acute states, ...
       admitted to Carney as a last resort placement....  Compounded by a
       history of limited physical/financial resources, the reality it that this
       Unit is isolated and separate from the rest of the hospital....

3.     One of the major underlying sources and causes of operational and
       performance dysfunction on the Unit is the "code of silence" that
       exists among all staff.  No regular staff or RN supervisor on the
       Unit ever witnesses inappropriate professional care or behavior by
       MHC staff or RNS.  This code results in a failure to report issues
       or concerns, and to reinforce a general attitude that reporting can
       trigger retaliation, intimidation, and/or be ignored or unsupported
       by others.  This is true of both staff and RNS.  Despite <u>*their status*</u>
       <u>*as licensed professionals*</u> (emphasis in original), RNS tend to feel

threatened by patients, and do not report incidents for fear that, in retaliation, they will not be protected by MHCs if, for example, a patient becomes violent....

4.        Whatever the reason, significant tension exists between many RNS and MHCs....  As a result, teamwork, communication and morale suffer, impacting on quality of care.  For example, many RNS do not assign MHCs to particular patients, indicate when the MHCs may take breaks, or ensure that MHCs are performing patient checks...  In addition, RNS typically do not follow up with MHCs for failure to perform their duties.  Similarly, when RNS do follow up with MHCs, their concerns are frequently dismissed.

5.        MHC staff, while experienced, educated, and generally dedicated to the concept of these careers and fully aware of the nature of the work, and licensed RNS (many of whom are trained for these Units) operate autonomously, and talk aside, seem to lack motivation to perform  – and do not perform  – *at standards of excellence* (emphasis in original).  For example, many RNS spend the majority of their time in the locked nurses' station, rather than interacting with the patients.  Similarly, many MHCs "hang out" together during their shifts, (and) do not perform required checks of patients....  Both RNS and MHCs habitually sleep on the job, particularly on the night shifts.  In addition, both RNS and MHCs have resisted  – and questioned  – efforts over the past year to change and/or implement policies ... designed to enhance patient care....

6.....   MHCs often arrive late for their shifts, take breaks without notifying the RNS, or take breaks at the end of their shifts and leave the hospital before their shifts have ended.  Similarly, MHCs report that RNS remain in their station, isolated from the floor and patients for the majority of the time during their shifts....

7....    A culture exists that became a standard of, and excuse for, "mediocrity" at best.  This culture (i.e., "just put up with it," "don't rock the boat," "roll with the punches") ... has permeated both the management and the staff of the Unit.  We agree with several of those we interviewed who believed that the only way to reform the management of the Unit was to "blow it up and start anew."  This is one of the major reasons we recommend to the new leadership that they develop a totally new managerial model, drawing upon mental health and adolescent psychology experts in management

and care, to advise and counsel Carney about developing  – and
implementing  – best practices.

On cross examination, Mr. Harshbarger acknowledged that his suggestion  –  to fire all

the staff who had been assigned to 5N  – was not the only option:

> Q: You weren't suggesting, were you, that the recommendation
> you made was the only possible way to solve the problem, but
> rather ... you felt it was the best option, is that correct?
>
> A: I felt under the circumstances that was the best option, yes.
>
> Q: But not necessarily to only option?
>
> A: That's correct.

Moreover, and somewhat remarkably, Attorney Harshbarger testified both on direct and cross

that he did <u>not</u> factor into his recommendation  -- to fire the 5N entire staff  – any opinion on

whether the Hospital could <u>legally</u> do so under the just cause standard set forth in the collective

bargaining agreement, or any other applicable legal standards.  Rather, he testified, he made his

recommendation simply as the best way for the Hospital to proceed from a health care delivery

perspective, <u>if</u> it could legally proceed in that manner.

On the same day that President Walczak received this written report from Harshbarger, by

letters dated May 26, President Walczak terminated the six nurses that are the grievants in this

arbitration proceeding, as well all the other RNS and MHCs who had been employed as staff on

5N.  Each of the six nurses received an identically worded letter informing them of the

termination of their employment:

> This is to inform you that your employment by Carney Hospital has
> been terminated, effective May 26, 2011.  This action follows the
> Hospital's investigation of your conduct at work....

As noted in the report above, President Walczak already had terminated the employment of the

Hospital's chief nursing officer, Carol Krzywda, and the patient care director, Carmel Hanrahan.[6]

While the termination letters state that this employment action "follows the Hospital's

investigation of your conduct at work," before terminating these six nurses, Walczak did not

review their personnel files or prior disciplinary history (if any) of the six nurses..  He did not

discuss with any of these six RNS the problems that had been identified on 5N.  He did not

provide to any of the six any statement of charges of alleged deficiencies in their work.  He gave

none of the six nurses any opportunity to respond to any charges specifically against them  – or

against the collective staff.  Nor did he provide to any of them a copy of the Harshbarger report.

When he made his decision to terminate these six nurses, President Walczak did not know if any

one of them had specifically contributed to the four incidents which had occurred on 5N in April.

Rather, the president explained, his decision to terminate was based on his conclusion

that these nurses, along with all the rest of the 5N staff, were collectively at fault for the failings

on 5N:

---

[6]Before making his May 26, 2011 decision to terminate all the 5N staff, President Walczak also had
received an anonymous letter dated May 2, apparently from an RN with working experience on 5N.  As was learned
only at the arbitration hearing, the author of this letter was Claire Langdon, RN, who had worked as a per diem on
5N for about five shifts in 2009, five shifts in 2010, and three shifts in 2011.  Ms. Langdon testified that much of
what was stated in her letter was based on hearsay rather than personal observation.  Much of the focus of this
anonymous letter was upon allegations of serious work deficiencies by the MHCs, which RNS had reported to
management time and again, and management's repeated failure to respond to those concerns which had been raised
by the RNS.  Certainly the anonymous letter also cited concerns about RN conduct such as sleeping on the night shift
(as observed by management with no repercussions), but overall, it contained a scathing criticism of the managers
and their utter and ongoing failure to respond to the concerns repeatedly raised by the RNS.

> My conclusion ... was that ... all the reports I received indicated a complete breakdown in the unit such that the patients, who were all children, were left unsafe with checks that were not occurring as required ... by the doctors' orders....  If the nurses weren't aware of the fact that there were incidents going on, they shouldn't be in those positions.  And, if they were aware and didn't report it, then they shouldn't be in those positions.  So that was my decision tree regarding that termination (action)....

The MNA filed grievances asserting that the Hospital had acted without just cause when it terminated each of the 13 RNS who had been regularly assigned to 5N.  Six of those grievances have been consolidated into this arbitration proceeding.

### The Post-Termination Effort to Rehabilitate 5 North

After the six nurses and all the rest of the 5N staff had been terminated, the information Lydik-Kaslow had collected from her investigations of the four April incidents ultimately was incorporated into a Root Cause Analysis, which was presented to Hospital management in July 2011.  Lydick-Kaslow in her testimony confirmed that she was not involved in the termination decisions, other than making her 10 minute report in generalities to President Walczak back in late April 2011.

In response to the various concerns which had been raised by Ms. Kinkead, and based upon her recommendation, the Hospital hired Nan Stromberg as a consultant.  Ms. Stromberg arrived on site in early May 2011, and thereafter advised the Hospital regarding corrective steps that should be taken to assure that top quality care would be provided on the adolescent psychiatric unit.  One of the concerns shared by both Stromberg and Kinkead was that after the retirement of Ms. Queeney as head nurse with responsibility exclusively over 5N, that unit lacked

focused managerial direction and supervision.  It was their perception that while the psychiatric

services provided on 5N had been of excellent quality in prior years, after Queeney retired and

was not replaced the quality of services on 5N deteriorated.  Ms. Stromberg in August 2011

presented to the Hospital a formal "Strategic Plan for Incorporating Principles and Practices of

Recovery, Trauma-Informed Care and Preventing the use of Restraint and Seclusion and other

Coercive Practices."

By all accounts, the adolescent psychiatric unit as reconstructed after the mass

terminations is functioning well.  There is all newly employed staffing, from the Chief Nursing

Officer to the Patient Care Director and on down to all RNS and MHCs.  There has been an

aggressive education and training program that has focused on such issues as de-escalation

techniques and psychiatric interventions.  The performance of 5N is being closely monitored by

DMH.  Ms. Kinkead opined in her testimony that the strategic plan is working, and that as of

February 2012, there had been a positive culture change on the unit.


## SUMMARY OF THE POSITIONS OF THE PARTIES

### The Position of the Employer, Steward Carney Hospital

This case involves collective guilt and responsibility.  When investigations were held in

response to the horrific events of April 2011 on 5N, senior leadership uncovered an avalanche of

information which painted a picture of a unit in chaos and ruin.  The results of the investigations

implicated the nursing management which was supposed to provide oversight and direction of

the care on 5N, the nurses working the various shifts on 5N, and right on down to the MHCs who

provided much of the direct care to the adolescent population.  There had developed a culture of

mediocrity, with a lack of reporting, substandard care, and patient assaults.  Within the span of

less than a month, reports were made from 5N of alleged sexual abuse of a patient by an MHC,

physical abuse of a patient, sexual relations between patients, and suicide attempt.  As the

Hospital' president explained, he could not "in good conscience allow that unit to continue

operating as it was and be able to feel like there was any possibility of safety of the children that

were put on that unit."

Given these facts, it would be virtually impossible for any nurse working on 5N for any

period of time (and the six RNS in this proceeding all had years of service on 5N) to be unaware

of the substandard and dangerous level of care being provided to patients.  Even if a particular

nurse were outstanding and caring, the visible dysfunction of the unit would be impossible to

miss and unconscionable to ignore.  Yet that is what happened here: a culture developed in which

negligence, insubordination, disregard, and sheer apathy took the place of reason.

In these extraordinary circumstances, the Hospital asserts, the collective responsibility is

as compelling as individual responsibility.  Although, because of the culture of silence, there may

not be detailed evidence of particular incidents of misconduct by any of the six grievants  –

beyond the record evidence that they were aware of and did nothing about substandard care  – the

evidence aptly demonstrates that the adolescent psychiatric unit for which these nurses were

responsible was utterly dysfunctional and unsafe.  Given these circumstances, Carney Hospital in

its case in chief has presented sufficient evidence which, if not rebutted, would show that it had

just cause to terminate these six nurses for their collective culpability, given the dysfunction of

the unit that they were responsible for.  Accordingly, the arbitrator should deny the motion for

directed verdict, and order the MNA to proceed with any defense it may have.

In the alternative, if the arbitrator were to find that the Employer through its case in chief has failed to meet its burden of proving just cause, the equities and circumstances of this case require that any reinstatement order be limited to returning the six nurses only to the adult psychiatric unit, not the adolescent unit.  Such an order would make the six nurses substantially whole, since the pay and benefits are the same.  With all the hard work that has gone into reconstructing 5N into a center of excellence, that progress should not be jeopardized by forcing the Hospital to return these six nurses to the adolescent unit.[7]

## The Position of the Massachusetts Nurses Association

First, the Employer utterly failed to afford to the six grievants even the most rudimentary due process.  The Hospital never put any of the six nurses, before or even at the point of their terminations, on notice of any allegations of supposed misconduct or improper work performance on their parts; and the Hospital never gave any of these six nurses any meaningful opportunity to respond to any such allegations.  Such fair notice and opportunity to respond was not provided by Harshbarger, Lydik-Kaslow or President Walczak.  Nor did the outside agencies provide this most basic due process to the nurses; indeed, DMH and DCF were focused on possible work deficiencies by the MHCs, not the RNS.  For this lack of due process alone, it must be concluded that the Hospital acted without just cause when it terminated each of the six grievants.

Second, on the merits, the Hospital in its case in chief failed to meet its burden of proving dischargeable misconduct by any of these six nurses.  The Hospital accuses all 13 nurses

---

[7]The Employer in its brief also makes a mootness argument, based upon a representation regarding an offer of reinstatement with full back pay and benefits (but not to 5N) which it made to the six nurses who are grievants in this case.  However, this asserted offer of reinstatement is not part of the record before this arbitrator, and accordingly, this mootness argument is unsupported by the record evidence as it currently exists.

collectively with generally failing to keep 5N safe for the adolescent, psychiatric patients by inadequately supervising the MHCs and/or failing to report unsafe conditions to management or the outside, regulatory entities.  This Employer theory of collective guilt and responsibility, however, cannot suffice to establish just cause, at least not in the absence of convincing proof that each individual nurse actually engaged in the misconduct for which accusations were broadly leveled against the collective group as a whole.  There is in this case no such evidence of personal misconduct by any one of the six nurses, and thus, on the merits, it must be concluded that there was no just cause for the Hospital to terminate any of these six individuals.

Third, even if the arbitrator were to find that the Employer in its case in chief presented sufficient evidence to prove some level of misconduct by any of the grievants, the concept of progressive discipline would still require that the termination action be struck down, and only a lesser, corrective disciplinary action should be upheld.  If one or more of the six nurses in some respect came up short in her/his work responsibilities, the record evidence would not support summary termination of employment without the benefit of corrective discipline.

For each of these reasons independently, it must be concluded that the Employer in its case in chief failed to establish that it had just cause to terminate any of these six nurses.  The arbitrator should order reinstatement to the adolescent psychiatric unit, with full back pay and benefits.  Anything less would leave the nurses with less than the full, make whole relief to which they are entitled.

## DISCUSSION

I will begin my analysis of this case with a consideration of the MNA's argument that on the merits, the Employer has failed to meet its burden of proving dischargeable misconduct by any of the six nurses who are the grievants in this arbitration proceeding. I begin here because, in the final analysis, the Union is correct that the Employer failed to meet its burden of proving that any of these six RNS committed dischargeable misconduct. Accordingly, for this reason alone, it must be concluded that the Hospital acted without just cause when it terminated each of the nurses who are the grievants in this proceeding.

I agree with the Union that the concept of collective guilt and responsibility does not suffice to establish just cause to terminate any particular member of the group, at least in the absence of convincing proof that the individual member personally committed the alleged misconduct for which accusations were leveled at the group as a collective body. It is wrong, and inherently and fundamentally inconsistent with the contractual standard of just cause, to terminate the innocent along with others who may be guilty, even if enough of the guilty members in the group may have committed misdeeds with such regularity such that the overall performance of the group is remarkably deficient. The burden of proof that an employer must meet in a just cause case carries with it a presumption of innocence, which is only defeated by a convincing showing that the presumptively innocent employee in fact has personally committed misconduct justifying disciplinary action.

Did the Employer meet its burden of proving individual culpability in this case? This question requires an individual analysis, grievant by grievant. Starting with Grievants Gail Douglas, Cheryl Hendrick, and Scott McLellan, the answer quite clearly is no, that burden was

not met.  I base this conclusion upon the following considerations.

The Employer argues that it heard from many different directions and sources, that many nurses who were in charge of 5N on their work shifts were failing to assign MHCs to perform mandated patient checks, and/or were failing to monitor and assure that the assigned checks were in fact being properly performed.  Moreover, the Employer argues, many nurses were failing to report to their superiors patient abuse, neglect or other serious incidents and/or work deficiencies by the MHCs which had the effect of jeopardizing the safety and well being of the patients on 5N; or, if such reports were made to superiors but were not acting upon, the nurses were failing to go beyond their managers to higher Hospital management or even to outside regulatory entities, to insist that their safety and health concerns were properly addressed.   As the Hospital's president saw it, "If the nurses weren't aware of the fact that there were incidents going on, they shouldn't be in those positions.  And, if they were aware and didn't report it, then they shouldn't be in those positions."  In essence, the Hospital argues, the inference should be drawn, from the stunning level of dysfunction on 5N, that each and every individual nurse was personally culpable for failed to see the obvious, or was grossly irresponsible for failing to report what they in fact had seen of this shocking and obviously unsafe level of dysfunction.

However, even assuming it is proven that many nurses on many shifts were inattentive to their duties, it is not appropriate to therefore infer that each and every nurse on every shift was guilty of that same neglect of duty.   Even assuming the worst for many nurses on various shifts, it still could be true, for example, that Scott McLellan, on the shifts he supervised, took care to properly assign MHCs to patient checks, and to monitor that they properly performed those checks and their other duties as assigned, and to report each and every incident that warranted

reporting on his watch.  The fact that he reported no incidents calls for the innocent presumption

that no reportable incidents occurred on his shifts, not the shocking presumption that incidents

did happen which he failed to report.  Assuming for discussion that MHCs were inclined to slack

off, or worse be abusive toward patients, whenever when they could get away with it, one could

reasonably presume that if they knew that McLellan was providing attentive and disciplined

supervision, they would not engage in such misbehaviors when he was one of the on-duty RNS

overseeing any given shift.  RN McLellan, and each of the other five grievants in this case, is

entitled to that presumption of innocence, unless there is convincing evidence to overcome it.

The Employer suggests that the record evidence as a whole suggests, in quite a

frightening manner, that incidents of patient neglect or abuse, including but not limited to

improper application of restraints, likely were happening far more than on the five occasions

which came to light in April 2011, and were not being reported as required by the nurses on duty.

Yet, the fact is, the five April incidents did all get reported and come to the attention of

management and the outside regulators, and those reports resulted in the very investigations that

ultimately led to the termination of these grievants.  This is not a case where, for example, only

one incident was reported, or came to light although never reported, and then an investigation

was commenced, and only then were other, previously unreported incidents unearthed.

Reporting did happen regarding all five of the April 2011 incidents –  although the Employer

may argue not precisely by the books regarding timeliness or breadth of reporting.  Because the

Employer, notwithstanding its investigation, did not unearth additional, unreported incidents

from April which should have been reported, the fairer inference to be drawn, and the necessary

one given the presumption of innocence, is that the absence of reported incidents from Scott

McLellan's shifts is an indicator that reportable incidents did not happen on his watch.

Mr. McLellan was selected to use above by way of example, because he was not even working on any of the shifts on which the five deeply distressing incidents occurred in April 2011.[8]  The Employer's justification for terminating RN McLellan is one based almost entirely on collective guilt and responsibility, with a claim of individualized guilt supported only by negative presumptions based upon the broadly reported dysfunction within 5 North.  Such a negative presumption simply is not supported by the record evidence, and it eviscerates the presumption of innocence to which Mr. McLellan was entitled pursuant to the just cause standard set forth in the parties' collective bargaining agreement.

With nothing more, the same analysis similarly applies to Gail Douglas and Cheryl Hendrick, the other two grievants who were not even working when any of the five investigated, April 2011 incidents occurred.  They stand in the same shoes as Mr. McLellan, with the only evidence of personal culpability that they worked on a unit where a number of other nurses and/or other staff members arguably may have been deficient in the performance of their duties.  On the merits, then, the record evidence does not support a claim that the Hospital had just cause to discipline McLellan, Hendrick or Douglas at any level, much less to terminate their employment.

The analysis regarding Linda Herr is slightly, but not materially, different.  She was working on the evening shift on April 18, when one of the incidents occurred.  However, the record evidence establishes that she was away from 5N taking her authorized dinner break, with

---

[8]Moreover, the record contains evidence from the mouth of David Pennacchia, who was not shy about giving negative opinions about the work of the nurses on 5N, suggesting that Mr. McLellan was doing his work in a professional and competent manner.

Nurses Langdon and Blanchard and three MHCs remaining on the unit.  Even under the Hospital's own analysis, Ms. Herr was not responsible for what happened while she was away on her supper break, nor was she the nurse who had the responsibility to file the required incident reports regarding that incident.  Moreover, although Ms. Herr was the charge nurse for the shift, there was no allegation raised that she had failed to assign the MHCs to perform the required patient checks on that shift, or failed to assure that the MHCs properly performed those assigned checks.  Given that Ms. Herr was not alleged to have done anything wrong on that April 18 shift, even though the events of that shift presumably were carefully reviewed during the course of the Hospital's investigation, Ms. Herr ends up in the same posture as McLellan, Hendrick and Douglas.

The Herr analysis applies with equal force to Nydia Woods.  She worked the evening shift on April 24, but she was not the charge nurse.  The Employer's own analysis was that it was Charge Nurse Dwyer  – not a grievant in this arbitration proceeding  – who had failed to properly assign the MHCs to perform patient checks at the specified times, and to assure that they were properly performed as scheduled.  Given that Ms. Woods was not alleged to have done anything wrong on that April 24 shift, even though the events of that shift presumably were carefully reviewed during the course of the Hospital's investigation, Ms. Woods ends up in the same posture as McLellan, Hendrick and Douglas, and Herr.

The Employer cites certain testimony offered by Social Worker Pennacchia at the eighth and final day of the Employer's presentation of its case in chief in this arbitration proceeding.  Pennacchia testified that Ms. Woods told him that she did not believe in trauma-informed care  – even though this was the treatment modality established by the medical director for the unit.  He

testified further that he had observed Ms. Woods being short with patients, and closing doors on

them if she did not want to deal with them.  He also testified that he once saw Ms. Woods call

security simply because a patient refused to move from a doorway, but was not otherwise

bothering anyone; Pennacchia felt that this interaction had not been therapeutically valuable.  The

Employer contends that this testimony confirms that Ms. Woods was a contributor to the poor

quality of care and the general dysfunction on 5N, and "corroborates the reports that Steward

relied upon in making its decision to terminate the employment of the grievants (the six nurses)

in this case."

      If the suggestion is that Pennacchia's testimony about alleged shortcomings in Ms.

Woods' clinical approach provided support for the termination of her employment, the argument

misses the mark.  If there were disagreements between Pennacchia and Woods regarding the best

clinical approaches to one situation or another, the needed approach was to share his concerns

with supervisors, and let supervisors guide and direct the approaches to be followed.  This would

call simply for supervisory and managerial guidance and direction, not for summary termination

of employment.  If there had been supervisory direction given to Ms. Woods, and it had been

ignored (but there is no evidence that this ever happened), then the application of corrective

discipline might have become warranted  – but not summary termination.  In sum, these

expressions by Pennacchia, in his testimony at the arbitration hearing, of his disagreement with

certain of Ms. Woods' clinical approaches changes nothing with respect to conclusion that the

Employer in its case in chief failed to present evidence sufficient to establish just cause for the

summary termination of Ms. Woods.

The remaining grievant of the six in this case is Kathleen Lang. She was on duty as the charge nurse on the day shift on Saturday, April 2. She was in the area when the incident occurred between MHC Kano and the female patient. Ms. Lydik-Kaslow testified that as she came to understand it, "Ms. Lang at the time of the incident was leading the patient to her patient room.... She was, I believe, a little bit in front of the patient.... She (Lang) didn't witness the entire event. She said she witnessed water on the floor and then the counselor and the patient slipping into the water and going against the wall ... which is not verbatim but what she basically reported in the incident report." Lydik-Kaslow conceded that if the MHC in fact grabbed the patient's hair, RN Lang may not have seen that; Lang "did report him contacting the patient physically."

The Employer argues that Ms. Lang, as charge nurse, personally failed to completely provide all of the notifications and documentation that were required, given the incident which had transpired. Thus, at least in the case of Ms. Lang, the Employer suggests it has submitted proof of individual misfeasance on her part.

In assessing this argument, it is helpful to begin with a review of what reporting and documentation Ms. Lang did complete. Lang called security, and security officers responded to 5N. Lang also immediately informed the on-duty physician who was working at the Hospital that day, and he immediately came and examined the patient – and determined that the patient had suffered only a superficial abrasion so that no significant medical care was warranted. Lang made an entry in the patient's medical record of the abrasion which the patient had suffered, and the care provided. Lang also immediately informed the nursing supervisor who was on duty that Saturday, so that reporting presumably assured that nursing management was aware of and could

oversee and review the nursing response to this incident.  In addition, Ms. Lang wrote an incident report which was submitted to Lydik-Kaslow, which predictably led to what presumably was a thorough and careful review of the entire incident, including what reporting and documentation had occurred.    And finally, Ms. Lang gave the requisite notice to the DCF guardian.

Lydik-Kaslow opined that Ms. Lang also needed to immediately inform the patient's attending physician, Dr. Pravdova.  The record evidence indicates that the grievant did notify Dr. Pravdova on Monday, but Lydik-Kaslow was of the view that this was too late to meet the requirement of "immediate" reporting.  However, on that weekend, Dr. Pravdova was off duty, and the other attending physician for the patients on 5N, Dr. Korndorfer, was providing the on-call coverage for the weekend.  Lydik-Kaslow was not aware of whether Lang had notified Dr. Korndorfer, the on-call attending physician on the weekend, and if she did, whether that notification would have met the requirement for immediate reporting.

This is an instance where the presumption of innocence must control, unless there is affirmative proof that a needed report was not made.  As the record evidence is constituted, the Employer has failed to meet its burden of proving that Ms. Lang failed to make a requisite, immediate report to the attending physician.  Rather, as the record stands, she may have notified Dr. Korndorfer who was the on-call attending for the weekend, and that reporting may have been sufficient to fulfill this "immediate" reporting requirement.

Lydik-Kaslow also was of the view that because Ms. Lang had characterized the action of MHC Kano as a "physical hold," that constituted a form of restraint, and the fact of that restraint and the justifications for it should have been documented on the required DMH form, and in the patient's medical record.  Such documentation is required by DMH regulations.

It is unclear, however, that this was in any way or manner a "restraint" within the meaning and intent of the DMH regulations.  This certainly was not a nurse-authorized restraint, approved by a nurse and applied only after all lesser de-escalation strategies had been exhausted, pursuant to DMH regulations.   Charitably to Mr. Kano, it might have been a slip and fall, in which Kano and the patient came into contact and fell into the wall; or, uncharitably, it may have been an outright assault and battery by MHC Kano.  If Kano grabbed the patient's ponytail from behind and yanked her into the wall, as RN Kennedy (but not RN Lang) personally observed, this seemingly was abusive action by Kano, not in any way or manner a clinical "restraint" within the intent and meaning of the regulations.

The point of the reporting requirement, of course, is to keep DMH informed whenever and under what circumstances restraints are being applied, so that DMH can monitor that restraints are only be applied as required and in compliance with the mandated procedures.   With respect to the April 2 incident, DMH, DCF, nursing supervision and management at Carney, and medical staff at Carney **all** were notified of the April 2 incident.  Whether characterized as a "restraint" or not, then, DMH was informed, so it was able to investigate and react as it deemed appropriate.   The underlying purpose of the reporting requirement was met, whether or not exactly the right form was filled out.

This quite obviously is not a case of Mr. Lang trying to hide that an incident had occurred on her watch.  She made prompt and follow-up reports to myriad interested parties, and documented the incident extensively.  The entirely predictable follow-up inquiries happened, with all participants and potential witnesses questioned, so that as accurate as possible a picture could emerge.   If some additional report or documentation was needed, even after all the

reporting and documentation which Ms. Lang did provide, then nursing managers in their follow-up could and should have simply advised Ms. Lang to provide that added reporting.  Given these facts, discipline of Ms. Lang for supposed reporting deficiencies was not warranted, and certainly not summary termination of employment.

The Union argues that for an entirely separate reason, that being the total lack of the most rudimentary due process, the termination actions against each of the six grievants should be found to have been without just cause, separate and aside from any consideration of the merits of the termination actions.  I need not and do not reach this issue, since on the merits alone, it must be concluded that the Employer through the presentation of its case in chief did not meet its burden of proving that it had just cause to terminate any one of the six RNS who are the grievants in this arbitration proceeding.  I will simply note my agreement with the Union that the lack of even the most rudimentary due process in this case was quite remarkable.  These six nurses never were told that they were being investigated for possible discipline or termination, they never were given any specification of charges, and they never were given any opportunity to respond to any such charges.  Even the letters of termination gave no insight into what they allegedly had done wrong.  The lack of due process in the cases of these six nurses was stunning.  At a minimum, this total lack of even the most fundamental due process provides substantial added support to the conclusion that the termination actions were taken by the Hospital without just cause.

## REMEDY

The MNA asks for the standard remedy that routinely applies in cases of improper termination in violation of a contractual just cause standard: reinstatement to the positions the grievants held on the adolescent psychiatric unit, with full back pay and benefits, with interest.

The Employer argues that any reinstatement order should be limited to returning the six grievants to the adult psychiatric unit, not the reconstituted adolescent psychiatric unit.  The Employer notes that the nurses if returned to the adult unit would receive the same pay and benefits, so such a restricted reinstatement order would not disadvantage the six grievants economically.  The Employer notes that the six nurses are "fully qualified" to work on the adult unit, and indeed some of them previously have floated down to that unit from time to time.

The Employer contends that it "could be disastrous" to the ongoing success of the reconstituted adolescent unit, if these nurses were to return there.  The Hospital contends that 5 North has gone from a "culture of mediocrity, a deviant culture," to a professional, safe, patient-oriented unit, and that progress could be jeopardized if it were forced to return these nurses onto 5 North.  Ms. Kinkead commented in her testimony about how problematic it had been when, after a MHC had been discharged for alleged patient abuse, that individual had been reinstated back onto 5 North.  Kinkead theorized that his reinstatement likely perpetuated the culture of abuse on the unit  – indeed, the same MHC was later again accused of patient abuse.  Kinkead suggested that the same negative result could result if the Hospital were forced to return to 5N the six RNS who are the grievants in this proceeding.

This argument fails to recognize the core finding in this arbitration proceeding.  In total contrast to the MHC referenced in the preceding paragraph, none of these six nurses have been charged with, much less found guilty of, abuse or neglect of the patients on 5N; while there appears to be little doubt that some awful things happened on 5N in April 2011, none of these six nurses were the perpetrators in those very serious incidents.  Nor has it been shown that these six nurses personally contributed to a "culture of mediocrity and/or a deviant culture."

It is enormously significant that the Hospital's own root cause analysis demonstrated that there were substantial and numerous causes for any deficits that existed on 5 North, not related to the alleged deficiencies in the work of these six RNS.  These other causes notably included a remarkably deficient level of supervision and management of the unit, lack of proper training, inadequate staffing levels at times, and a less than ideal physical layout of the Unit.  To the Hospital's credit, it has undergone an aggressive, and seemingly successful, effort to correct these deficiencies.   Quite simply, there is no evidence that these six nurses, with proper managerial direction and oversight, and training as the Hospital may wish to provide, would do anything other than contribute well and with professionalism to the laudable successes that have been accomplished on 5 North in the past two years.

Accordingly, the standard remedial order will be made, with only minor caveats.  The Hospital shall reinstate the six nurses to the positions and schedules they previously held on the adolescent psychiatric unit.  The Employer shall expunge from their personnel files any allegations or findings of wrongdoing by any of the grievants regarding the April 2011 incidents and the ongoing problems on 5 North prior to their terminations. The Hospital shall make the grievants whole for all wages and benefits they lost by virtue of their unjust terminations.  Any

back payments due to the grievants pursuant to this award shall be made with interest at the rate of six percent per annum, compounded annually.

The minor caveats are these.  First, the Employer may initially reinstate any or all of the six grievants to positions other than on 5 North, while each is provided with further training as the Employer deems appropriate, consistent with the training that has been provided to other nurses employed to work on 5 North.  Apparently, and quite appropriately, the Hospital has implemented a robust training regimen for the nurses employed on 5N, and the Hospital may assure that the six grievants have received the benefit of that training before they are returned to 5N.  The grievants shall receive full wages and benefits while they are undergoing any such training.

Second, the Employer may stagger the return of the six grievants to 5N over the span of up to a month, so that the returnees will be blended with staff that have been on the reconstituted unit during the absence of the six grievants.   Moreover, needless to say, the Employer would still have the discretion temporarily to expand the number of RNS on duty on any given shift, as the returnees get settled into the work routine on the adolescent psychiatric unit.

With those caveats, the traditional remedial order, as mapped out above, shall be applied.

ArbdecCD:CarneyHospital&MNAdec.wpd